RTP:OO/PP
F. #2021R00019

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | **TO BE FILED UNDER SEAL** |
| - against - | <u>COMPLAINT AND AFFIDAVIT IN SUPPORT OF ARREST WARRANT</u> |
| JEREMY MONK, | |
| Defendant. | (18 U.S.C. §§ 1791(a)(1) and 1791(b)(3)) |
| | 22-MJ-805 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

JAMES G. DOBIS, being duly sworn, deposes and states that he is a Special Agent with the United States Department of Justice, Office of the Inspector General ("DOJ-OIG"), duly appointed according to law and acting as such.

On or about April 15, 2022, within the Eastern District of New York and elsewhere, the defendant JEREMY MONK did knowingly and intentionally, in violation of a statute or a rule or order issued under a statute, provide and attempt to provide prohibited objects to a prison inmate.

(Title 18, United States Code, Sections 1791(a)(1) and 1791(b)(3))

The source of your deponent's information and the grounds for his belief are as follows:[1]

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

1.       I am a Special Agent with the DOJ-OIG and have been involved in the investigation of numerous cases involving official corruption and other crimes against the government.  I am familiar with the facts and circumstances set forth below from my participation in the investigation, my review of the investigative file and from reports of other law enforcement officers involved in the investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part.

I.      Background

2.       The DOJ-OIG, the United States Attorney's Office for the Eastern District of New York, and the Federal Bureau of Investigation are investigating the receipt of bribes by United States Bureau of Prisons ("BOP") correction officers and staff in exchange for smuggling contraband, including cellular telephones and narcotics, into the Brooklyn Metropolitan Detention Center ("MDC"), a federal jail in Brooklyn, New York.  The MDC is currently New York City's only federal detention facility.  Although most individuals incarcerated at the MDC are detained pre-trial based on federal charges in the United States District Court for the Eastern District of New York or the United States District Court for the Southern District of New York, some individuals at the MDC have already been convicted or sentenced.  Currently, approximately 1,600 individuals are incarcerated at the MDC.

3.       In connection with this investigation, agents have conducted interviews and reviewed, among other things, telephone call detail records, recorded prison telephone

calls, e-mail communications, video recordings, cell site location tracking information and financial records, including from mobile payment applications such as Cash App.

4. Incarcerated individuals at the MDC are not permitted to possess contraband inside the MDC. According to the BOP's Standards of Employee Conduct (the "Standards of Employee Conduct"), contraband is defined as "material prohibited by law, or by regulation, or material which can reasonably be expected to cause physical injury or adversely affect the security, safety, or good order of the institution," which includes narcotics, cellular telephones, and cigarettes, among other prohibited items. I have learned that contraband often sells inside BOP facilities for many multiples greater than its cost outside of BOP facilities.

5. The BOP's Standards of Employee Conduct expressly forbids BOP employees from "offer[ing] or giv[ing] to an inmate or a former inmate or any member of his/her family, or to any person known to be associated with an inmate or former inmate, any article, favor, or service that is not authorized in the performance of the employee's duties" and from "accept[ing] any gift, personal service, or favor from an inmate or former inmate, or from anyone known to be associated with or related to an inmate or former inmate." BOP employees are also not permitted to be "financially involved with inmates, former inmates, or persons known (or who should have been known based on circumstances) to the employee as a family member or close friend of inmates or former inmates."

6. In addition to being prohibited from introducing or distributing contraband, BOP employees are also required to "report to [the Warden] any violation, appearance of a violation, or attempted violation of these Standards or of any law, rule, or

regulation" and "immediately report to management any act or omission by any person that could result in a breach of institution security."

7. All BOP correction officers, among other BOP employees, receive copies of the Standards of Employee Conduct and sign forms acknowledging receipt when they begin their employment. Employees also receive yearly training on the topics contained therein, including the regulations against contraband.

II. The Defendant

8. The defendant JEREMY MONK began his employment as a correction officer with BOP on or about May 26, 2020. On or about May 26, 2020, MONK signed a form acknowledging that he had received the Standards of Employee Conduct and that he understood his conduct was to be governed by those standards. Beginning on or about May 27, 2020, MONK was assigned to the MDC, where he worked until on or about April 18, 2022, when he voluntarily resigned.

III. Contraband Smuggling into the MDC

A. MONK Brings Contraband into the MDC on April 15, 2022

9. On or about April 15, 2022, at approximately 2:00 p.m., the defendant JEREMY MONK reported to work at the MDC to serve a 2:00 p.m. to 10:00 p.m. shift. MONK was assigned to monitor the G-42 housing unit (the "G-42 Housing Unit") and was the only correction officer assigned to the unit during the shift. Prior to MONK's arrival at work that day, MDC staff members had received information from an inmate that MONK might attempt to bring contraband into the MDC; among other information, the inmate told MDC staff that MONK had been paid $10,000 to smuggle drugs, alcohol and tobacco in a

black bag into the MDC, place the items in a staff restroom and leave the door unlocked for later retrieval by an inmate.

10. Surveillance video footage from inside the MDC showed that the defendant JEREMY MONK entered the MDC at approximately 2:00 p.m. carrying, among other items, a black plastic bag. At approximately 2:38 p.m., MONK walked through the G-42 Housing Unit towards a staff restroom (the "Restroom") carrying a white rectangular object and keys in his hands. The Restroom, which is a single occupant use restroom, is normally locked and inaccessible to MDC inmates except under the supervision of MDC staff, who maintain keys for the Restroom. At approximately 2:42 p.m., surveillance video shows MONK walking away from the direction of the Restroom. At approximately 2:43 p.m., based on the intelligence received regarding MONK, a MDC staff member secured the Restroom door and did not permit anyone else to enter the Restroom. Shortly thereafter, MDC staff members recovered two vacuum-sealed, clear packages hidden below two floor buffing pads on a shelf; the packages contained approximately 9.67 ounces of a green leafy substance that subsequently tested positive for the presence of marijuana. MDC staff immediately reassigned MONK to a low security area for the remainder of his shift.

11. The defendant JEREMY MONK was next scheduled to work at the MDC three days later on Monday, April 18, 2022, beginning at approximately 8:00 a.m. Prior to reporting to work that day, MONK called the MDC's Human Resources department and stated that he wanted to immediately resign. When asked why he was resigning, MONK stated, in sum and substance, because of "some stupid investigation." MONK, in fact, resigned that morning.

B.  MONK's Delivery of Contraband to MDC Inmates on Prior Occasions

12. The investigation shows the defendant JEREMY MONK had previously smuggled contraband into MDC to give to an inmate. On or about December 5, 2020, MDC staff members conducted a search of a prison cell because they suspected that an occupant of the cell, an individual whose identity is known to me ("Inmate-1"), was in possession of marijuana due to an odor coming from his assigned cell. Although marijuana was not discovered, MDC staff recovered a cellular telephone inside the cell (the "Contraband Device"). Inmate-1 was placed in the Special Housing Unit for violating BOP regulations.[2]

13. Subsequently, Inmate-1 requested to speak with a member of MDC's Special Investigations Services ("SIS"), which is responsible for, among other things, investigating violations of BOP regulations. During this interview, Inmate-1 stated, in sum and substance and relevant part, that he was involved in smuggling and selling drugs, cellular telephones and tobacco inside the MDC with the defendant JEREMY MONK, and that MONK had met Inmate-1's family members to obtain money.

14. Following the interview of Inmate-1, law enforcement obtained records which, based on my training, experience and knowledge of the investigation, show

---

[2] Inmate-1 was convicted by a federal jury of racketeering conspiracy, in violation of Title 18, United States Code, Sections 1962(d) and 1963(a), and has been sentenced to 240 months' imprisonment. Inmate-1 is currently serving his sentence at another BOP facility; he was not provided any benefits for the information he provided to MDC officials.

that Inmate-1, along with another person, Individual-1,[3] paid the defendant JEREMY MONK to bring contraband into the MDC.

15.     A review of e-mails between the Inmate-1 E-Mail Account and a Google e-mail account registered in the name of Individual-1 (the "Individual-1 E-Mail Account-1") show multiple communications in which Inmate-1 used Individual-1 as a conduit to relay messages to or from other individuals, transfer money and engage in conduct consistent with contraband smuggling into MDC.

16.     For example, on August 10, 2020, the Inmate-1 E-Mail Account sent an e-mail to the Individual-1 E-Mail Account-1 that states in part: "Your Husband Said to text, and say: [XXX-XXX-7404]: Tell City that Will said his text app is not working, and that if he can send $700 to a Cash App for me, I'll send him this bp-199 for $1,200. Or he can grab it out of the account.   But I need it done today please.   To get the CA, CALL [XXX-XXX-4053] (the "4053 Number")."[4]   Based on my training and experience, as well as the investigation, in this e-mail, Inmate-1 was instructing Individual-1 to give a message to someone he referred to as "City" to send $700 to a Cash App account on his behalf.   In addition, based on the investigation, when Inmate-1 wrote, "[t]o get the CA, CALL [the 4053

---

[3] In his BOP contact list, Inmate-1 designated Individual-1 as a "Spouse." Based on the investigation to date, including a review of records from Inmate-1's BOP e-mail account (the "Inmate-1 E-Mail Account"), Inmate-1 and Individual-1 are romantically involved.

[4] Telephone records indicate that the 4053 Number is subscribed to by Individual-1.

Number]," Inmate-1 was instructing the person to contact Individual-1 to get the relevant Cash App ("CA") information.

17. In another example, on September 14, 2020, an e-mail was sent from the Individual-1 E-Mail Account-1 to the Inmate-1 E-Mail Account that states in part, "Hey, I got the 420." Based on my training and experience, I believe "420" is a reference to marijuana and marijuana-related activities and that Individual-1 was advising Inmate-1 that she had acquired marijuana.

18. Records obtained from Cash App show that Individual-1 attempted to transfer funds to the defendant JEREMY MONK via Cash App multiple times on December 2, 2020, three days before MDC staff detected the smell of marijuana from Inmate-1's cell and found the Contraband Device on December 5, 2020. Cash App records show eight attempted transactions between Individual-1 and MONK on December 2, 2020, including five attempts by Individual-1 to send $4,000 to MONK, one attempt by Individual-1 to send $1,000 to MONK, and one attempt by Individual-1 to send $750 to MONK.[5] All of these attempted transactions were blocked by Cash App. Cash App also blocked further transactions between Individual-1 and MONK.

19. In addition, records obtained from Google pursuant to a judicially-authorized search warrant of a Google e-mail account registered in the name of Individual-1 (the "Individual-1 E-Mail Account-2") confirm that, on December 2, 2020, the

---

[5] Personal identifying information to include name, address, date of birth and the last four digits of their social security numbers link MONK and Individual-1 to these Cash App accounts.

defendant JEREMY MONK requested that Individual-1 send $4,000 via Cash App to MONK's Cash App account.[6]

20.    As of January 21, 2021, Inmate-1 was assigned to the G-43 housing unit at MDC.   On January 21, Inmate-1 advised a member of SIS that the defendant JEREMY MONK came to see Inmate-1 earlier that day and stated, in sum and substance and relevant part, that MONK had told Inmate-1 that MONK had two cellular telephones for Inmate-1.   Based on information provided to me from law enforcement officers at the MDC, surveillance footage from January 21, 2021 reveals that at approximately 8:24 a.m., MONK, who was assigned that day as the East Internal Officer in the east building within the MDC, entered the G-43 housing unit in the west building, and spoke to Inmate-1 for approximately one minute before departing the G-43 housing unit.   Based on my discussions with MDC staff, it is not consistent with BOP protocol for MONK to have left his assigned post to visit Inmate-1 in the G-43 housing unit.

WHEREFORE, your deponent respectfully requests that the defendant JEREMY MONK be dealt with according to law.   Your affiant also respectfully requests that this affidavit and any issued arrest warrant be sealed as the defendant remains at large

---

[6] Individual-1's Cash App account is registered with the Individual-1 E-Mail Account-2.

and public disclosure of this affidavit and/or arrest warrant may lead him to destroy evidence, flee or otherwise seek to avoid apprehension.

                    Digitally signed by James G. Dobis
                    Date: 2022.07.29 11:41:27 -04'00'

JAMES G. DOBIS
Special Agent, United States Department of Justice, Office of the Inspector General

Sworn to before me telephonically this
29th day of July, 2022

THE HONORABLE PEGGY KUO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK